IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT


Case No. 24-40658




UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.


LIZA GARCIA,

Defendant - Appellant



APPEAL FROM THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS, MCALLEN DIVISION
_____

APPELLANT'S BRIEF
_____

Christopher Sully
LAW OFFICE OF CHRIS SULLY
5804 N. 23rd St.
McAllen, Texas 78504
(956) 413-7271

## **CERTIFICATE OF INTERESTED PERSONS**

The undersigned counsel of record certifies that the following listed persons and entities have an interest in the outcome of this case. These representations are made in order that the judges of this honorable Court may evaluate possible disqualification or recusal.

1. The Honorable Ricardo H. Hinojosa, United States District Judge, and the Honorable Randy Crane, Chief United States District Judge

2. Liza Garcia ("Ms. Garcia"), Defendant-Appellant

3. United States of America, Plaintiff-Appellee

4. Counsel for Plaintiff-Appellee:
   Sarina DiPiazza and Jongwoo Chung (trial counsel)
   Carmen Castillo Mitchell (appellate counsel)

5. Counsel for Defendant-Appellant:
   Christopher Sully (trial and appellate counsel).


/s/ Christopher Sully
Christopher Sully

## <u>STATEMENT ON ORAL ARGUMENT</u>

Ms. Garcia respectfully requests oral argument, as the issues are complex and intertwined, and the record is unclear as to how the district court and government arrived at their calculations that resulted in the base offense level and sentence. The underlying facts are also complex, including differing valuations for different types of drugs which were allegedly combined in a single seized drug load from which the government and the district court seemed to attempt to extrapolate the composition of unidentified drug load(s) from which the laundered funds were allegedly derived.

The issues, though not numerous, are complex and are as follows:

ISSUE ONE: Whether the cross-reference should have been applied and whether Ms. Garcia committed the underlying offense from which the laundered funds were derived or should be held accountable for said offense.

ISSUE TWO: Whether the cross-reference should have been applied and whether the offense level for the underlying offense from which the laundered funds were derived could have been determined.

ISSUE THREE: Whether the offense level for the underlying offense from which the laundered funds were derived was accurately determined.

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS ........................................................1

STATEMENT ON ORAL ARGUMENT ................................................................2

TABLE OF CITATIONS.......................................................................................4

STATEMENT OF JURISDICTION ......................................................................5

STATEMENT OF THE ISSUES ...........................................................................5

STATEMENT OF THE CASE ..............................................................................6

Facts .....................................................................................................................6

Indictment………………………………………………………..……..…..7

Guilty Pleas………………………………………………………………...8

Presentence Report………………………………………………………..10

Objections…………………..………………………………………...……..11

Sentencing…………………..…………………………………………...……..12

Notice of Appeal…………………………………………………………..27

SUMMARY OF THE ARGUMENT....................................................................27

ARGUMENT .......................................................................................................30

ISSUE ONE (whether Ms. Garcia committed underlying offense) .......................29

ISSUE TWO (whether underlying offense level can be calculated).......................33

ISSUE THREE (whether the offense level was properly calculated) .....................47

CONCLUSION ...................................................................................................56

CERTIFICATE OF SERVICE.............................................................................56

CERTIFICATE OF COMPLIANCE ....................................................................57

## TABLE OF CITATIONS

*Gall v. United States*, 552 U.S. 38, 128 S. Ct. 586 (2007)…………………30, 33, 47

*United States v. Alaniz*, 726 F.3d 586 (5th Cir. 2013)………………….30, 33, 47-48

*United States v. Anderson*, 526 F.3d 319 (6th Cir. 2008)……………………….…40

 *United States v. Blackmon,* 557 F.3d 113 (3d. Cir. 2009)…………………….36-39

*United States. v. Diaz-Menera,* 60 F.4th 1289 (10th Cir. 2023)……………...…40-44

*United States v. Sifuentes*, 945 F.3d 865 (5th Cir. 2019)………………………35-36

*United States v. Soto*, 819 F.3d 213 (5th Cir. 2016). …………....…..…30, 33, 47

*United States v. Trujillo*, 502 F.3d 353 (5th Cir. 2007) …………….…..…30, 33, 47

## **STATEMENT OF JURISDICTION**

Jurisdiction of this Court is invoked under 28 U.S.C. § 1291 as an appeal from a final judgment of conviction in the United States District Court for the Southern District of Texas, McAllen Division, and under 18 U.S.C. § 3742, as an appeal of a sentence imposed under the Sentencing Reform Act of 1984. Notice of appeal was timely filed in accordance with Rule 4(b) of the Federal Rules of Appellate Procedure.

## **STATEMENT OF THE ISSUES**

ISSUE ONE: Whether the cross-reference should have been applied and whether Ms. Garcia committed the underlying offense from which the laundered funds were derived or should be held accountable for said offense.

ISSUE TWO: Whether the cross-reference should have been applied and whether the offense level for the underlying offense from which the laundered funds were derived could have been determined.

ISSUE THREE: Whether the offense level for the underlying offense from which the laundered funds were derived was accurately determined.

## STATEMENT OF THE CASE

### *Facts*

On April 30, 2021, David Apaseo was arrested at the Hidalgo, Texas, Port of Entry while driving a vehicle into the U.S. from Mexico loaded with cocaine, methamphetamine, heroin, and fentanyl. ROA.332. Liza Garcia was not present and was not charged or arrested at the time. At the time of his arrest, Mr. Apaseo did not implicate Ms. Garcia, who was the mother of his girlfriend. ROA.333. Months later, he implicated an unindicted coconspirator who was Ms. Garcia's boyfriend. ROA.334.

Eventually, he also mentioned Ms. Garcia, claiming that she was supposed to drive the load vehicle, instead of him, but was unable to do so because she had to go to work at her legitimate job as an inventory technician. ROA.334. It was not clear whether she was even aware of the drug load or had even been asked to drive or whether she had not been asked since she had to work.

Anyway, he also claimed that Ms. Garcia gave him phone numbers of people who were unindicted coconspirators in Mexico, including a person who collected money. ROA.335. Mr. Apaseo added that the unindicted coconspirator instructed him to send drug proceeds through intermediaries using money service businesses (MSBs). ROA.335. He said that Ms. Garcia did the same. ROA.335. On August 13,

2021, Ms. Garcia was arrested at her residence; no drugs or large amounts of cash were found. ROA.336.

### *Indictment*

On August 10, 2021, Ms. Garcia was indicted, along with codefendant David Apaseo, in a twelve-count superseding indictment. ROA.17-23. Count One charged her with conspiring with Mr. Apaseo from September 2020 to April 30, 2021, to import at least 500 grams of methamphetamine, at least one kilogram of heroin, and at least 400 grams of fentanyl. ROA.17. Count Two charged her and Mr. Apaseo with importing approximately 12 kilograms of methamphetamine, approximately 13 kilograms of heroin, and approximately 6 kilograms of fentanyl on April 30, 2021. ROA.18. Count Three charged her and Mr. Apaseo with conspiring to possess with intent to distribute at least 500 grams of methamphetamine, at least 1 kilogram of heroin, and at least 400 grams of fentanyl between September 2020 and April 30, 2021. ROA.18-19. Count Four charged her and Mr. Apaseo with possessing with intent to distribute approximately 12 kilograms of methamphetamine, approximately 13 kilograms of heroin, and approximately 6 kilograms of fentanyl on April 30, 2021. ROA.19. Count Five charged her and Mr. Apaseo with conspiring to import at least 500 grams of cocaine between September 2020 and April 30, 2021. ROA.19-20. Count Six charged them with importing approximately 4 kilograms of cocaine

on April 30, 2021. ROA.20. Count Seven charged them with conspiring to possess with the intent to distribute at least 500 grams of cocaine between September 2020 to April 30, 2021. ROA.20-21. Count Eight charged them with possessing with the intent to distribute approximately 4 kilograms of cocaine on April 30, 2021. ROA.21. Count Nine charged Ms. Garcia only with money laundering drug proceeds between September 2020 to April 2021 with the intent to promote the carrying on that unlawful activity, pursuant to 18 § USC 1956(a)(1)(A)(i) and 2. ROA.21-22. Count Ten also charged Ms. Garcia with money laundering, but with the intent of concealment, rather than promotion, between September 2020 and April 2021, pursuant to 18 § USC 1956(a)(1)(B)(i) and 2. ROA.22-23. Count Eleven again charged Ms. Garcia with money-laundering between September 2020 to April 2021, but this time with international money-laundering with the intent of promotion, pursuant to 18 § USC 1956(a)(2)(A) and 2. ROA.22. Count Twelve likewise charged her with international money-laundering, but this time with the purpose of concealment, pursuant to 18 § USC 1956(a)(2)(B)(i) and 2. ROA.22-23.

### *Guilty Pleas*

On March 24, 2023, Ms. Garcia pled guilty to Count 10, while Mr. Apaseo pled guilty to Count 2. ROA.274. Again, Count Ten charged Ms. Garcia with money laundering with the intent of concealment between September 2020 and April 2021,

pursuant to 18 § USC 1956(a)(1)(B)(i) and 2. ROA.22-23. Count Two charged her and Mr. Apaseo with importing approximately 12 kilograms of methamphetamine, approximately 13 kilograms of heroin, and approximately 6 kilograms of fentanyl and April 30, 2021. ROA.18.

At the re-arraignment hearing, the government and Ms. Garcia stipulated to the following facts as to Count Ten:

> From on or about September 20, 2020 to April, 2021, Liza Garcia did knowingly conduct, and attempt to conduct, a financial transaction affecting interstate and foreign commerce. [To wit]: The transfer of United States currency, which involved the proceeds of a specified unlawful activity, that is, the distribution of a controlled substance, an offense punishable under Title 21 of the laws of the United States. She knew that the transaction was designed in whole or in part to conceal the -- and disguise the nature, source, ownership, and controlled the proceeds of some form of unlawful activity. While conducting and attempting to conduct such financial transaction, she knew that the funds involved in the financial transactions represented the proceeds of some unlawful activity. Within those dates, the Defendant knowingly used monies, services, businesses located in Houston, Texas and Edinburg, Texas on at least three occasions to transmit a total of at least $3,961 in United States currency to at least two different people in Mexico; namely, Rosa Valla (phonetic) Gomez (phonetic) and Arial (phonetic) Martinal (phonetic) Cortez (phonetic) on behalf of another individual who recruited Miss Garcia who made the transfers. These financial transactions affected interstate and foreign commerce in that they involved the sending of money across international and state borders through wire transmission. The financial transactions involved the proceeds of a specified allotment, namely, the distribution of narcotics in violation of Title 21 of the United States Code, and that the funds sent to Mexico included payments derived from the smuggling of narcotics. The Defendant knew that at least some portion of the money involved was derived from some form of unlawful activity -- activity that is a felony under federal, state, or foreign law. The transactions were designed, at least in part, to conceal or disguise the nature, source,

ownership, or control of said proceeds and that by handling the transfer sent by the Defendant and under her name, the person who recruited her to send the transfers, concealed that he was the source of the funds.

ROA.428-30.

### *Presentence Report*

Even though Ms. Garcia only pled to money-laundering and not drugs, the presentence report (PSR) applied a cross-reference, pursuant to USSG § 2S1.1(a)(1), as if Ms. Garcia had committed the underlying offense (drug importation) from which the laundered funds were derived. ROA.281. Even though no funds were derived from Mr. Apaseo's importation attempt, since the drugs were seized at the port of entry, the PSR used that load, anyway, to calculate the offense level for the underlying offense from which the laundered funds were derived, yielding a base offense level of 38. ROA.283. The PSR then added two levels for importation of methamphetamine because "[t]he defendant's offense of conviction involved the importation of a mixture or substance containing methamphetamine", even though Ms. Garcia was convicted of money-laundering, not importation of methamphetamine. ROA.283. Realizing that Ms. Garcia was convicted of money-laundering under 18 USC § 1956, the PSR then added two levels for that. ROA.284. Ms. Garcia had not debriefed with the government for safety-valve, as she was not convicted of an applicable drug offense; nevertheless, the PSR applied the drug

guidelines and denied her the safety-valve reduction for which she otherwise would have qualified. ROA.284. After subtracting two levels for acceptance of responsibility, the total offense level was 40. ROA.285.

## *Objections*

In her original objections and a series of subsequent filings, as well as at a series of sentencing hearings, Ms. Garcia objected to the cross-reference and the resulting enhancements. ROA.291-93 (objections), 372-433 (sentencing memorandum), 457-526 (reply to government's response), 527-558 (exhibits), 122-44 (response to government's caselaw), 202-12 (7/31/24 hearing), 216-26 (8/15/24 hearing), 229-67 (final 10/2/24 sentencing hearing). Ms. Garcia argued that she should be sentenced to time served or probation with an adjusted offense level of 6, which yielded 0-6 months, according to the Guidelines, as she was in Criminal History Category I:

| Guideline | Offense Level | Notes |
|---|---|---|
| § 2S1.1(a)(2) | 8+0 | No points should be added due to the amount of the laundered funds, because it is not more than $6,500, based on the amount ($3,961) mentioned in the stipulated plea facts. If the amount were more than $6,500 but not more than $15,000, then +2 would be added, and the adjusted offense level below would be 8 (still 0-6 months). |
| § 2S1.1(b)(2)(B) | +2 | Since the conviction was under 18 U.S.C. § 1956, unless that objection is granted |
| § 3E1.1 | -2 | Acceptance of responsibility |
| § 4C1.1 | -2 | Zero-point offender |
| Adjusted offense level | 6 | 0-6 months per Guidelines chart |

ROA.380.


### *Sentencing*

Mr. Apaseo was sentenced to 31 months of imprisonment by Judge Hinojosa for importing narcotics. ROA.194. Ms. Garcia, despite being convicted of money-laundering, rather than drug-trafficking, was later sentenced to 57 months of imprisonment (almost double Mr. Apaseo's sentence), followed by a three-year term of supervised release, by Chief Judge Crane on October 2, 2024. ROA.266.

The district court seemed to agree with Ms. Garcia that the underlying offense from which the laundered funds were generated could not have been the seized drug load in Count 2 that Mr. Apaseo was convicted of attempting to import, since it was seized and did not generate any funds. ROA.226. Nevertheless, the district court eventually based the offense level on "the drugs that were actually confiscated, and then their street values at the time," even though the drugs that were confiscated never made it to the street to be sold and therefore could not generate funds for Ms. Garcia or anyone to launder. ROA.265-66.

The court started with a base offense level of 28. ROA.266. Then, it added 2 levels for the section 1956 enhancement. ROA.266. After subtracting three points for acceptance of responsibility and two levels for being a zero-point offender, it arrived at a total offense level of 25. ROA.266. With no criminal history points, this yielded a guideline range of 57-71 months. ROA.266. The court sentenced Ms. Garcia to the low end of that range at 57 months. ROA.266.

How the district court arrived at the base offense level of 28 was complicated and unclear, and even the district court expressed hesitation with the result. The court started by explaining that it wanted to calculate the base offense level based on an estimated quantity of drugs that would be worth about $10,000. ROA.230. This was apparently based on the PSR's claim that Ms. Garcia was responsible for a total of $10,300 being sent to Mexico through money-service business, based on unspecified

"financial records." ROA.336. However, the amount specified in her plea colloquy was only $3,961—less than half the amount adopted by the district court. ROA.428-30.

The district court remarked that it knew that a kilo of cocaine was worth about $10,000. ROA.230. The prosecutor incorrectly responded that there was no cocaine in the seized load—just methamphetamine, fentanyl, and heroin. ROA.230-31. The prosecutor then called an HSI agent to testify as to the values of those drugs. He testified that one kilogram of methamphetamine was worth about $2,000; one kilogram of fentanyl was worth about $15,000; and one kilogram of heroin was worth about $18,000. ROA.234-35.

The agent clarified that he was testifying as to current values in October 2024 and that the values were actually higher in 2021 when the drugs were seized from Mr. Apaseo, but he did not specify how much higher the values actually were 3.5 years earlier at the time of the seizure in Mr. Apaseo's case (April 30, 2021). ROA.235-36. The government did not present evidence as to what the drug values actually were at the time of the seizure in this case or, more importantly, when the laundered funds were generated prior to that.

The fact that the drug values were higher at the time is significant, because the higher the value (the denominator that the laundered funds are divided by), the lower the resulting drug amount, and therefore the base offense level, would be. By

using incorrectly low values, the resulting drug amount and base offense level would be too high.

Furthermore, the agent was testifying as to drug values "in the local area", presumably the McAllen, Texas, border area where he was at the time. ROA.234. This was after the court clarified that it wanted to know the values "south of the checkpoint, cause I know everything goes up north of the checkpoint." ROA.232. Therefore, the court was asking for the lower values south of the checkpoint, rather than the higher values north of the checkpoint, such as in Houston. However, as noted in the PSR, Mr. Apaseo would always deliver the drugs to Austin, Dallas, or Houston, never locally. ROA.276. It was not clear whether the drugs were then sold on the street in Austin, Dallas, or Houston (all north of McAllen and of the checkpoint) or continued traveling north from there. Either way, the value of the drugs by the time they were actually sold and generated funds that could be laundered by Ms. Garcia or anyone else would have been significantly higher than they were in the local area south of the checkpoint, as the district court acknowledged. Therefore, by using the lower value in the local area south of the checkpoint, even though the drugs were not sold there (they were seized and never sold, but presumably would have been sold in Austin, Dallas, or Houston or somewhere further north for higher values), the district court used a denominator

(drug value) that was too low, resulting in a drug amount and base offense level that was too high.

On cross-examination, the agent admitted that he was not familiar with this case and did not even know when the drugs in this case were seized. ROA.236-37. Nevertheless, he testified that methamphetamine was worth about $3,000 per kilogram in 2021, rather than the $2,000 he had testified to moments before—an increase of 50%. ROA.237.

He then testified that the heroin and fentanyl would also have been worth about 25% more. ROA.237. Specifically, he testified that heroin would have been worth about $20,000 per kilogram, but this was only about 11% higher than the $18,000 figure he testified to earlier. ROA.237. Had the price been 25% higher as he claimed, then the value of the heroin would have been $22,500 per kilogram (1.25 x $18,000). He then testified that fentanyl would have been worth around $18,000 per kilogram in 2021; this was 20% higher than the $15,000 figure he gave earlier (25% higher would have been $18,750). ROA.237.

According to the indictment, the drug trafficking and money laundering started around September 2020 and continued until the drug seizure occurred in April 2021. ROA.17-23. Again, the drug load that was seized did not and could not generate any funds to be laundered. That means that the funds that Ms. Garcia laundered had to have originated from earlier drug loads. Accordingly, the agent was

asked about drug values in 2020 and responded that they were about 10% higher than in 2021. ROA.237-28. Adding 10% to the values the gave for 2021 would yield: $3,300 per kilogram of methamphetamine (instead of $3,000); heroin $22,000 per kilogram of heroin (instead of $20,000); and $19,800 per kilogram of fentanyl (instead of $18,000).

Furthermore, the agent clarified that all the values he had given were wholesale values from distributor-to-distributor, rather than the higher street value that the final consumer would pay. ROA.238-29. If the higher street values were used as the denominator, the resulting drug amount and base offense level would obviously be lower. However, he stated that he did not know much higher the street values would be. ROA.239.

He also confirmed that the value of the drugs would generally increase the further north they traveled before being sold. ROA.239-30. He said that fentanyl would be an exception, since it comes across the West Coast and then down to the Rio Grande Valley of Texas. ROA.239-40. However, the fentanyl in this case was seized at the Hidalgo, Texas, Port of Entry, coming in from Mexico. Confusingly, he also testified that fentanyl would be worth "about $7" in the Rio Grande Valley and would therefore be "a little bit more expensive here than further north." ROA.239. This was after he had testified that fentanyl was worth at least $18,000 per kilogram. Anyway, he did confirm that values for methamphetamine and heroin

would be higher further north away from the Rio Grande Valley, but he did not clearly specify how much higher those values would be. ROA.240.

Defense counsel tried to point out that a fellow HSI agent had testified in a trial before the same judge that methamphetamine was worth around $5,000 per kilogram—more than twice as much ($2,000) as the testifying agent was claiming in this case. ROA.241-44. In other words, the lower value claimed by the testifying agent here could more than double the resulting drug amount and increase the resulting offense level. Eventually, the agent here admitted that the methamphetamine could have been worth up to $6,000 per kilogram, because he knew of a deal that happened two years prior (in 2022, the same year as the seizure in this case) for that price. ROA.245. He seemed to imply that this was a wholesale deal and that the street value would have been even higher. ROA.245. Even so, the $6,000 figure he gave was triple the value ($2,000) he originally gave. Using the higher ($6,000) value would result in a drug amount that would be only one-third of the drug amount that would result with the lower ($2,000) value. In other words, using the lower value would result in a drug amount that was three times what it would be with the higher value that he eventually conceded.

The agent also agreed that the value of the drugs would increase with its purity and would also be affected by other factors, making its value quite variable and dependent on those factors. ROA.241-45. However, he conceded that he did not the

purity of the drugs in this case and did not have any specific knowledge about this case. ROA.245-46. Therefore, his values presumably did not take into account the purity of the drugs in this case. The PSR did not state the purity of the other drugs but noted that the methamphetamine sampled was 99% pure, which would, according to the agent, increase its value and would, therefore, decrease the resulting drug amount when the funds laundered were divided by the higher drug value. ROA.280. Again, the agent had no specific knowledge about this case and therefore did not know the specific drug values in this case or how much drugs were sold at what price in order to generate the laundered funds in this case. ROA.245-46. This was a crucial admission given the agent's testimony that drug values are variable and dependent on several case-specific factors. ROA.241-45.

The district court seemed to recognize that the values that the agent gave were based on wholesale or multi-kilogram quantities near the border and were therefore lower than they would be for the final consumer on the street further north in Houston or beyond. ROA.247. The court also seemed to recognize that using the lower value would result in a higher drug amount and a higher guideline sentence. ROA.247.

Nevertheless, the court argued that it did not matter, because even if it used the higher $6,000/kilogram value for methamphetamine, the resulting drug amount would still be over 1.5 kilograms ($10,000/$6,000=1.67 kilograms) (which would

still yield a base offense level of 32). ROA.246-47. As noted before, however, the $6,000 figure was apparently based on a wholesale local deal and was probably lower than the value would have been further north in Houston or beyond or in street/retail quantities. A slightly higher (approximately 11% higher) value of $6,711.41 would have resulted in an amount below 1.5 kilograms ($10,000/$6,711.41=1.489 kilograms) (which would yield a base offense level of 30, instead of 32, based on the table in USSG § 2D1.1(c)).

Using the $20,000/kilogram value for heroin that the agent had given would have yielded 0.5 kilograms of heroin ($20,000/$10,000=0.5 kilograms), resulting in a base offense level of only 26—6 levels lower than the calculation the district court made based on methamphetamine. *See* USSG § 2D1.1(c)(7). The government agreed that it would have arrived at a base offense level of 26. ROA.254.

The government and the district court seemed to agree that the calculation based on fentanyl would result in about 600 grams of fentanyl and a base offense level of 30. ROA.254.

However, the seized load in this case was not comprised entirely of methamphetamine, heroin, or fentanyl. According to the PSR, it consisted of 3.99 kilograms of cocaine (net weight), 10.56 kilograms of heroin (net weight), 12.45 kilograms of methamphetamine (gross weight of bundles, net weight not provided), 6.29 (kilograms?) of fentanyl mixture (gross weight, net not provided), and another

1.12 kilograms of heroin (gross weight, net not provided). ROA.279-80. That means the load was comprised roughly of 12% cocaine, 33% heroin, 36% methamphetamine, and 18% fentanyl mixture (3.99+10.56+12.45+6.29+1.12=34.41; 3.99/34.41=0.116; 10.56/34.41=0.307; 12.45/34.41=0.362; 6.29/34.41=0.183; 1.12/34.41=0.033 (added to the 0.307)). The government claimed at sentencing that the load was comprised of 12 kilograms of methamphetamine, 13 kilograms of heroin (the PSR only listed 11.68 kilograms at most above), and 6 kilograms of fentanyl and omitted the approximately 4 kilograms of cocaine. ROA.257.

In any event, the composition of the prior loads which were not seized and from which the laundered funds were derived is unknown. It is not known if they even contained cocaine, heroin, methamphetamine, fentanyl, or some other substance or in what amounts.

Even though the seized load was comprised of approximately 4 kilograms of cocaine—approximately 12% of that seized load—the prosecutor repeatedly claimed that there no cocaine, even after the district court repeatedly inquired about cocaine and mentioned that it knew that the value of cocaine was around $10,000 to $11,000 per kilogram:

> **THE COURT:** … I could take the drug proceeds here, ten grand.  And then I could estimate the quantity of drugs.  And then —— and do the cross reference that way.  So that's what I said I was going to do.

**MS. DIPIAZZA:** Yes, your Honor.

**THE COURT:** But, so $10,000, 11,000 somewhere in there. I happen to know that's about a kilo of cocaine. But I don't have any——

**MS. DIPIAZZA:** It'd be simple ——

**THE COURT:** —— evidence of that.

**MS. DIPIAZZA:** The load wasn't cocaine. And I have an agent here to testify.

ROA.230-31.

**THE COURT:** And there was no coke? I thought there was some cocaine there also.

**MS. DIPIAZZA:** No, your Honor.

**THE COURT:** No.

**MS. DIPIAZZA:** It was just ——

**THE COURT:** Okay.

**MS. DIPIAZZA:** —— meth, heroin, and fentanyl.

ROA.233. The government's repeated insistence that there was no cocaine contradicted Counts Five, Six, Seven, and Eight of the superseding indictment that alleged that there were approximately 4 kilograms of cocaine. ROA.19-21.

The district court seemed to base its valuation of cocaine based on prior caselaw, which seemed to support valuations between $10,000-$15,000 per kilogram. ROA.216-19. If the district court was correct about the value of cocaine,

then basing the offense level on cocaine would have resulted in a lower offense level than any of the other drugs, resulting in a base offense level of 24 ($10,000/$10,000=1 kilogram) (see USSG § 2D1.1(c)(8)), rather than the 28 that the court ultimately used. ROA.257.

Even if the district court were incorrect about the value of cocaine, cocaine still results in a lower base offense level than the other drugs and therefore is a less serious drug for purposes of sentencing. For example, one kilogram of cocaine results in a base offense level of 24. (USSG § 2D1.1(c)(8)); one kilogram of "actual" methamphetamine results in a base offense level of 34 (USSG § 2D1.1(c)(3)); one kilogram of fentanyl results in a base offense level of 30 (USSG § 2D1.1(c)(5)); and one kilogram of heroin also results in a base offense level of 30 (USSG § 2D1.1(c)(5)). Therefore, the government misrepresented to the district court that the seized load did not contain cocaine, which was the least serious of all the drugs mentioned and which, if considered, probably would have resulted in a lower base offense level.

If the seized load was comprised of 12 kilograms of methamphetamine, 13 kilograms of heroin, 6 kilograms of fentanyl, and approximately 4 kilograms of cocaine, and the methamphetamine were valued at $6,000 per kilogram, the heroin at $20,000 per kilogram, the fentanyl at $18,000 per kilogram, and the cocaine at $10,000 per kilogram, then the total value of that load would have been worth

$480K—far more than even the $10,000 that Ms. Garcia allegedly laundered ((12x$6K=$72K)+(13x$20K=$260K)+(6x$18K=$108K)+(4x$10K=$40K)=$480 K). The $10K that Ms. Garcia allegedly laundered is 2% of $480K ($10K/$480K=0.02).

The government claimed that combining the offense levels for each drug would somehow result in a base offense level of 30. ROA.254. Later, it revised the figure to 28. ROA.256. It is not clear how the government (or the district court) arrived at those figures, but it appears that perhaps it took the average of the offense level for each drug by adding the offense levels together and then dividing them, rather than using a weighted average. ROA.255. In any event, it did not do a weighted conversion to converted drug weight as the Guidelines would require. ROA.255.

At one point, the district court decided to base its calculation solely on heroin in order to give Ms. Garcia "the benefit of the…doubt", which would have resulted in a base offense level of 26. ROA.254-55. Nevertheless, the district court ultimately adopted the government's suggested base offense level of 28. ROA.257.

How the district court, or even the government, arrived at that number was unclear, and the district court expressed uncertainty with the result and admitted that it was not clear on the record how the base offense level was calculated:

> **THE COURT:** Yeah. I'm worried about the appeal on this.  It's just kind of a tough ——

**(Pause in the proceeding.)**

**THE COURT:** And —— and we're not really on the record  here showing how we merged all of those to come out with a 30.

**(Pause in the proceeding.)**

**THE COURT:** Did we just convert them all to marijuana? Is that what we did?

**MS. DIPIAZZA:** No, your Honor.

**THE COURT:** We do covert them to ——

**THE COURT:** I think —— so —— so, initially, we had at $2,000 5.15 kilos meth, which is a Level 34.  And then the fentanyl is Level 30.  The heroin is Level 26. So when you put them all together and average them out, it's a Level 30.[1]

**THE COURT:** Okay.

**MS. DIPIAZZA:** That's what we came to. Now I know that the Court is doing 1.5 to 5 kilos of meth, which would take us to a Level 32 instead of a Level 34.

**THE COURT:** Uh-huh.

**MS. DIPIAZZA:** So then I think the average would be a Level 28.

**(Pause in the proceeding.)**

**THE COURT:** All right. So ——

**(Pause in the proceeding.)**

---

[1] Based on the context, this is probably the prosecutor Ms. DiPiazza speaking.

**THE COURT:** I mean, it's —— you —— you got to defend this on appeal, Miss DiPiazza. You're —— you feel comfortable that you—— you have a good record here?

**MS. DIPIAZZA:** Yes, your Honor. We had a witness ——

**THE COURT:** Okay.

ROA.255-56.

All of these calculations were based on a laundered amount of approximately $10,000 ($10,300, to be exact), which was supplied by the PSR based on unspecified records. ROA.248-49. Ms. Garcia challenged this amount in her objections and at sentencing and argued that the district court should use the $3,961 amount from Ms. Garcia's plea colloquy, to no avail. ROA.249-54. Had the court used the lower figure, the resulting drug amounts would have been 60% lower (3,961/10,000=0.3961; 1-0.3961=0.6). A base offense level of 11 would have been 60% lower than the 28 applied by the district court. A sentence of 23 months would have been 60% than the 57 months imposed by the court. Therefore, the actual amount of the funds would have made a significant difference.

Starting with a base offense level of 28, the district court added two levels for the 1956 enhancement, subtracted 3 levels for acceptance and 2 pursuant to USSG § 4C1.1, which resulted in a total offense level of 25, yielding a Guideline range of 57-71 months. ROA.258. As stated above, the court sentenced Ms. Garcia to 57 months' imprisonment.

***Notice of Appeal***

Judgment was entered on October 4, 2024. ROA.151. Ms. Garcia timely filed a notice of appeal on the same day. ROA.156.

## SUMMARY OF THE ARGUMENT

ISSUE ONE: The cross-reference should not have been applied at all, because Ms. Garcia did not commit the underlying offense of drug importation and should not be held responsible for it. Mr. Apaseo attempted to import the drugs all by himself without her. As a result, the cross-reference should not have been applied at all.

ISSUE TWO: The cross-reference should have been applied, because the offense level for the underlying offense from which the laundered funds were derived could not be determined. The attempted importation of the seized drug load was not the underlying offense from which the laundered funds were derived; since it was seized at the port of entry, no funds could have been derived from it. The government failed to identify the drug load(s) from which the laundered funds were

derived, much less show that Ms. Garcia was involved in them. The seized load was the only one whose composition and size could be determined. The type and amount of drug(s) for the prior load(s) remain unknown. Therefore, the offense level for that load(s) still cannot be determined. As a result, the cross-reference should not have been applied.

ISSUE THREE: The offense level for the underlying offense from which the laundered funds were derived was incorrectly calculated. As explained above, the drug load(s) from which the laundered funds were derived was not even identified, and the type and amount of drugs there remain unknown. Therefore, the offense level for that load(s) cannot be determined at all, let alone accurately. Just because the seized load consisted of certain drugs and amounts does not mean any prior load(s) from which the laundered funds were derived was the same.

Moreover, the alleged amount of funds laundered by Ms. Garcia was too high, resulting in a drug amount and base offense level that were also too high. Therefore, the numerator in the equation was too high. The drug values that the agent claimed were not specific to this case, and therefore the denominator was too low, too. Consequently, the resulting drug values were too low, and the resulting drug amounts and offense level were too high.

Furthermore, it is unclear how the district court combined the resulting drug values to arrive at a combined base offense level, but apparently, the required converted weight calculation was not done. Additionally, the district court did not give Ms. Garcia the "benefit of the doubt" like it said it would by calculating the base offense level based on fentanyl, which seemed to yield the lowest base offense level of all the specified drugs.

Finally, based on the government's misrepresentation that there was no cocaine, the district court failed to consider the value and potential amount of cocaine in its calculation, which could have resulted in a lower offense level and therefore a lower sentence.

# ARGUMENT

ISSUE ONE RESTATED: Whether the cross-reference should have been applied and whether Ms. Garcia committed the underlying offense from which the laundered funds were derived or should be held accountable for said offense.

## Standard of Review

This Court "review[s] the district court's interpretation or application of the Sentencing Guidelines de novo and its factual findings for clear error." *United States v. Trujillo*, 502 F.3d 353, 356 (5th Cir. 2007) (footnote and italics omitted); *see also United States v. Soto*, 819 F.3d 213, 216 (5th Cir. 2016). Here, the enhancement was based on a combination of factual findings and interpretation or application of the Sentencing Guidelines, so review would also be a two-step process with different standards of review.

"'The government must prove factors for enhancement of sentencing by a preponderance of the evidence....'" *Trujillo*, 502 F.3d at 357 (5th Cir. 2007) (footnote and citation omitted). If properly preserved, a sentencing error is reviewed for abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51, 128 S. Ct. 586 (2007). If not properly preserved, it is reviewed for plain error. *United States v. Alaniz*, 726 F.3d 586, 618 (5th Cir. 2013). Ms. Garcia properly preserved her objections to the

cross-reference and the resulting sentence, so review would be for abuse of discretion.

### A. The cross-reference should not have been applied at all, because Ms. Garcia did not commit the underlying offense of drug importation and should not be held responsible for it.

Mr. Apaseo attempted to import the drugs all by himself. As a result, the cross-reference should not have been applied at all. The Sentencing Guidelines set out the conditions that must be met before the cross-reference may be applied:

> The offense level for the underlying offense from which the laundered funds were derived, *if (A) the defendant committed the underlying offense (or would be accountable for the underlying offense under subsection (a)(1)(A) of §1B1.3 (Relevant Conduct));* and (B) the offense level for that offense can be determined;

USSG § 2S1.1(a)(1) (emphasis added). If these conditions are not met, then the base offense level starts at 8, depending on the value of the laundered funds. USSG § 2S1.1(a)(2).

Therefore, the first necessary precondition before the cross-reference may be applied is that "the defendant committed the underlying offense (or would be accountable for the underlying offense…)". USSG § 2S1.1(a)(1). The PSR identified the underlying offense as the seized April 2021 load that Mr. Apaseo was caught

trying to import by himself without her. Ms. Garcia was not even there and was not otherwise responsible.

Moreover, the PSR identified the wrong "underlying offense." For purposes of the cross-reference, the "underlying offense" is the one "from which the laundered funds were derived". USSG § 2S1.1(a)(1). Since that load was seized at the port of entry, it generated no funds for Ms. Garcia or anyone else to launder. Furthermore, it happened after Ms. Garcia had already sent the money transfers constituting money laundering. Therefore, it could not be the "underlying offense from which the laundered funds were derived". USSG § 2S1.1(a)(1).

The government and the PSR were unable to identify the drug load(s) or "underlying offense from which the laundered funds were [actually] derived"— much less show that Ms. Garcia committed that underlying offense or was otherwise responsible for it. The government failed to meet its burden for this enhancement, which formed the basis of the sentence. Therefore, the first necessary precondition for the application of the cross-reference was not met, and the cross-reference, accordingly, should not have been applied at all.

ISSUE TWO RESTATED: Whether the cross-reference should have been applied and whether the offense level for the underlying offense from which the laundered funds were derived could have been determined.

Standard of Review

Again, this Court "review[s] the district court's interpretation or application of the Sentencing Guidelines de novo and its factual findings for clear error." *United States v. Trujillo*, 502 F.3d 353, 356 (5th Cir. 2007) (footnote and italics omitted); *see also United States v. Soto*, 819 F.3d 213, 216 (5th Cir. 2016). Here, the enhancement was based on a combination of factual findings and interpretation or application of the Sentencing Guidelines, so review would also be a two-step process with different standards of review.

"'The government must prove factors for enhancement of sentencing by a preponderance of the evidence....'" *Trujillo*, 502 F.3d at 357 (5th Cir. 2007) (footnote and citation omitted). If properly preserved, a sentencing error is reviewed for abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51, 128 S. Ct. 586 (2007). If not properly preserved, it is reviewed for plain error. *United States v. Alaniz*, 726 F.3d 586, 618 (5th Cir. 2013). Ms. Garcia properly preserved her objections to the cross-reference and the resulting sentence, so review would be for abuse of discretion.

## B. The cross-reference should not have been applied at all, because the offense level for the underlying offense could not be determined.

Again, the Sentencing Guidelines set out the conditions that must be met before the cross-reference may be applied:

> The offense level for the underlying offense from which the laundered funds were derived, if (A) the defendant committed the underlying offense (or would be accountable for the underlying offense under subsection (a)(1)(A) of §1B1.3 (Relevant Conduct)); and (B) *the offense level for that offense can be determined;*

USSG § 2S1.1(a)(1) (emphasis added). If these conditions are not met, then the base offense level starts at 8, depending on the value of the laundered funds. USSG § 2S1.1(a)(2).

Having discussed the first necessary precondition in the preceding issue, we now turn to the second necessary precondition, which is that "the offense level for [for the underlying offense from which the laundered funds were derived] can be determined[.]" USSG § 2S1.1(a)(1). As explained above, the first necessary precondition was not satisfied, and therefore the cross-reference cannot be applied, even if the second necessary precondition were met. Conversely, even if the first precondition were met, the cross-reference would still not apply because the second precondition is not met, either.

The PSR calculated the offense level for the April 2021 attempted importation of the seized drug load by Mr. Apaseo. However, that was not the "the underlying offense from which the laundered funds were derived…." USSG § 2S1.1(a)(1). Since the load was seized at the port of entry, it generated not funds to be laundered, and the money laundering transactions had already taken place prior to that load. Therefore, it could not be the "underlying offense" for purposes of the cross-reference.

No one was able to identify the underlying offense or drug load(s) from which the laundered funds were derived (much less show that Ms. Garcia was involved in or otherwise responsible for that offense). Since the underlying offense and the composition (type and amount(s) of drug(s)) in that drug load(s) could not be identified, the offense level could not be determined. Since it could not be determined, the cross-reference could not apply.

At the penultimate sentencing hearing and at the final sentencing hearing, the district court explained that it intended to emulate the methodology employed in prior cases cited by the government that tried to calculate the amount of drugs involved based on the amount of the laundered funds. ROA.216-26, 230-32. However, Ms. Garcia differentiated those cases. ROA.220-21, 122-44.

For example, *Sifuentes* actually cuts against the government's here, where the cross-reference was based on a seized load (the only load for which the offense level

could be calculated), rather than on a load that was sold and from which the laundered funds were derived. In *Sifuentes,* this Court held that an actual *sale* (with the intent to distribute) of a controlled substance is needed for the cross-reference to apply (since the funds need to be derived from a sale), rather than a mere conspiracy (since mere mental assent or an attempted sale does not generate funds that can be laundered):

> In this case [*Sifuentes*], the underlying offense from which the funds were derived is the sale of with intent to distribute a controlled substance, not conspiracy to possess with intent to distribute a controlled substance.

*United States v. Sifuentes*, 945 F.3d 865, 868 (5th Cir. 2019).

Here, the load that was being used as the basis for the cross-reference was not sold, as it seized before it could even reach its destination, and so it could not generate funds to be laundered. Therefore, *Sifuentes* actually weighs against applying the cross-reference here, where the load being used as the basis for the cross-reference was seized before it could be sold.

*Blackmon,* the Third Circuit case the district court referenced, also did not support the application of the cross-reference here and was quite different from the instant case. Unlike the case at bar, where Ms. Garcia was only convicted of a money-laundering count, the defendant Blackmon (in *Blackmon*) pled guilty to a charge of conspiracy to distribute more than five kilograms of cocaine, as well as a money-laundering charge. *United States v. Blackmon,* 557 F.3d 113, 116 (3d. Cir.

2009). As part of the conspiracy, Blackmon on several occasions shipped packages of cocaine to a coconspirator who would ship packages of cash back to Blackmon. *Id.* at 115. Thus, in *Blackmon*, unlike here, there was no question that the defendant participated in the drug loads that generated the laundered funds, and since Blackmon pled guilty to the cocaine conspiracy charge, his sentence would be determined, at least in part, by the quantities of cocaine he distributed. (Again, in contrast, here Ms. Garcia was only being sentenced on a money-laundering charge, not on any drug charge.)

In the instant case, the government sought to make Ms. Garcia somehow vicariously responsible for the seized load that her codefendant, Mr. Apaseo, imported on April 30, 2021, and to make that the basis for the cross-reference. In *Blackmon,* since the defendant Blackmon had shipped all the cocaine himself, vicarious responsibility was not an issue, and that case cannot be used to somehow impute responsibility on Ms. Garcia, just because she was allegedly part of a drug conspiracy, or for any other reason.

Since Blackmon used Federal Express to ship the cocaine packages, the district court was able to determine the amount of cocaine he shipped based on, among other extensive evidence, FedEx air bills that indicated that the packages he

shipped weighed approximately 148 kilograms.[2] *Blackmon*, 557 F.3d at 117 (3d Cir. 2009). This was part of extensive evidence presented during live testimony at sentencing. *Id.* at 117-18. (In contrast, here there was no way to even identify—let alone determine the weight of—the drug loads that generated the laundered funds in the instant case.) Accordingly, Blackmon's PSR had calculated the drug amount for both his drug charge and his cross-referenced money-laundering charge as 50-150 kilograms of cocaine. *Id.* at 117.

In calculating that amount of drugs as relevant conduct for the drug conspiracy, the PSR in *Blackmon* apparently included a single kilogram of cocaine from a "sting" transaction. *Id.* It is unclear if the PSR included that single kilogram when it calculated the offense level for the money-laundering cross reference, but in any event, it would not have changed the drug quantity range of 50-150 kilograms (since 148 kg of FedEx air bills + 1 kg=149 kg, still less than 150 kg). For the same reason, it also unclear if the district court counted that single kilogram, either. Also, a sting transaction is different from a seized load, particularly the seized load in this case. In Blackmon's sting transaction, Blackmon actually shipped a kilogram of cocaine to his former coconspirator (who, unbeknownst to Blackmon, had recently been arrested and agreed to cooperate with the government) and received a package

---

[2] Presumably, the 11 kilograms of seized cocaine were not part of the 148 kilograms of FedEx air bills, because seized loads could be directly weighed, without the need to estimate or derive their weight via FedEx air bills.

of $15,000 as payment. *Id.* at 116. Therefore, that cocaine load did actually produce funds for Blackmon, unlike the seized load in this case that was seized at the port of entry and was not sold and did not generate funds for anybody.

Notably, in *Blackmon,* several cocaine loads, totaling 11 kilograms, were seized, not including the sting transaction described above. *Id.* at 117. However, those loads were apparently not counted, for if they had been, the drug quantity range would have been over 150 kilograms, instead of 50-150 kilograms (since 148 kilograms of FedEx air bills +11 kilograms of seized equals 159 kilograms). The fact that seized loads were apparently not counted towards the cross-reference in *Blackmon* cuts against the government's argument here, which relied exclusively on counting a seized load that did not generate any funds.

The *Blackmon* opinion also contains a lengthy discussion of the extent of relevant conduct that should be applied under the cross-reference. *See id.* at 120-24. Ultimately, it agreed with the PSR and the district court that assessed the relevant conduct at 50-150 kilograms of cocaine. *Id.* As discussed above, this apparently excludes the seized loads that did not generate any laundered funds, which cuts against the government's argument here. In *Blackmon*, as in other cases that were cited by the government, there was no indication that a seized load that generated no funds (and in which the defendant did not directly participate) can be used to apply the cross-reference and calculate the offense level, as was done in the instant case.

The district court here (and the government) also made reference to a Sixth Circuit case: *United States v. Anderson*, 526 F.3d 319 (6th Cir. 2008). Unlike the instant case, where a seized drug load that generated no funds was used as the basis for a cross-reference and the resulting offense level, in *Anderson,* there was "no drug seizure..." *Anderson*, 526 F.3d at 326 (6th Cir. 2008) (the sentence, which was based on the cross-reference, was vacated). Even though there were no seizures, the district court was able to calculate the offense level for the drugs sold and, consequently, for the cross-reference. *Id.* at 324. Therefore, *Anderson* is inapposite here, where the cross-reference and offense level were determined on the basis of a seized load that generated no funds, and the offense level for the load(s) that did generate the laundered funds could not be calculated.

Finally, the district court (and the government) made reference to a Tenth Circuit case, *United States v. Diaz-Menera*, 60 F.4th 1289 (10th Cir. 2023) (Ebel, J., dissenting). Similarly to *Blackmon* above and to the instant case, there was a drug load seized in *Diaz-Menera*, but it apparently was not used to calculate the offense level or cross-reference—cutting against the government's argument here that a seized drug load that generated no funds should be used as the basis for a cross-reference.

The seized drug load in *Diaz-Menera* was four kilograms of methamphetamine that was seized from coconspirator Jose Manuel Aveja during a

traffic stop in a separate, but related, case. *United States v. Diaz-Menera*, 60 F.4th 1289, 1291 (10th Cir. 2023) (Ebel, J., dissenting). However, that load was not used to calculate the defendant Diaz-Menera's sentence. *Id.* at 1292-93. Instead, the offense level was calculated by working backwards from the funds Diaz-Menera laundered to the drug loads from which they were derived. *Id.* Unlike the instant case, those drug loads could be and were actually identified, rather than basing the calculation on any seized load. Ultimately, the district court only held the defendant Diaz-Menera liable for less than five percent of the methamphetamine the PSR attributed to him. *Id.* In so doing, the district court remarked on the lack of connection between the other amounts of drugs and the laundered funds:

> The district court declined to connect the other amounts of money to drugs, noting "[t]he government simply ha[d] not presented enough" evidence to conclude that all of the other laundered funds derived from methamphetamine sales."

*Id.* at 1293. Similarly, here the government could not make the connection between the load being used for the cross-reference and any laundered funds, because that load was seized and did not generate any funds. Therefore, it should have been excluded and not be used for any cross-reference, and yet, here, it was the basis for the cross-reference.

The dissenting opinion in *Diaz-Menera* rejected the idea that a money-launderer could be sentenced for the distribution of drugs even though the money launderer played no part in the distribution of those drugs. *Id.* at 1298. The dissent

also rejected the idea that a mere conspiracy, rather than actual drug sales, could be

the underlying offense from which the laundered funds were derived, as required for

the cross-reference:

> The majority's opinion relies entirely upon an erroneous premise: that the "underlying offense" referenced in subsection (a)(1) includes membership in a drug conspiracy. (Op. 1293-94.) This premise is mistaken for two reasons. First, the "underlying offense" referenced in subsection (a)(1) by the Guideline language must be the offense "from which the laundered funds were derived." U.S.S.G. § 2S1.1(a)(1) (emphasis added). For conspiracy, "the criminal agreement itself is the actus reus." United States v. Shabani, 513 U.S. 10, 16, 115 S.Ct. 382, 130 L.Ed.2d 225 (1994). **A conspiracy by itself does not produce any funds. Rather, the funds are derived from underlying actual drug sales, not the mere conspiratorial agreement. Hence, the laundered funds here were not "derived" from the conspiracy (which was a conduit through which drug proceeds were distributed after they were "derived" from the drug transactions). The funds were "derived" (e.g., generated or obtained) from the drug transactions which generated the funds.** Cf. United States v. Tee, 881 F.3d 1258, 1270 (10th Cir. 2018) (federal money-laundering statute is only violated if the "transaction generating the criminally derived proceeds is distinct from the money-laundering transaction"); see also United States v. Seward, 272 F.3d 831, 836(7th Cir. 2001) (". . . **the money laundering statutes criminalize 'transaction[s] in proceeds, not the transaction[s] that create [ ] the proceeds**.' " (quoting United States v. Mankarious, 151 F.3d 694, 705 (7th Cir.1998))).

*Diaz-Menera*, 60 F.4th at 1299 (10th Cir. 2023) (Ebel, J., dissenting) (emphases

added).

The dissent clearly rejected the idea that the "underlying offense" for purposes

of a cross-reference can be a conspiracy, rather than specific illegal drug transactions

from which the laundered funds were derived:

> If § 2S1.1(a)(1) had intended the "conspiracy" to be the operative event, it would have used that word. Instead, it used the words "underlying offense." Had § 2S1.1(a)(1) used the word "conspiracy," the majority opinion would be easy to defend. But here, § 2S1.1(a)(1) used the phrase "underlying offense"—not just any offense, but rather a specific underlying criminal offense that occurred under the overarching conspiracy. Here, the "underlying offense" could only mean one thing: the specific illegal drug transactions that underlay and supported the overarching crime of conspiracy.

*Id.* at 1302.

As explained above, this Court seemed to agree, in *Sifuentes,* that actual drug sales, not just mental assent or conspiracy, are required as the underlying offense for the cross-reference to apply:

> In this case, the underlying offense from which the funds were derived is the sale of with intent to distribute a controlled substance, not conspiracy to possess with intent to distribute a controlled substance.

*Sifuentes*, 945 F.3d at 868 (5th Cir. 2019).

Returning to *Diaz-Menera,* the dissent also points out that liability for the acts of others is more limited under the cross-reference than it normally would be for relevant conduct under U.S.S.G. § 1B1.3. *Diaz-Menera*, 60 F.4th at 1302 (10th Cir. 2023). This is because the cross-reference in § 2S1.1(a)(1) specifically cites only § 1B1.3(a)(1)(A) (acts or omissions "caused by the defendant"), excluding § 1B1.3(a)(1)(B) (acts and omissions of co-conspirators, even if they were "reasonably foreseeable" to the defendant). *Id.*

As the majority recognizes, a defendant can only be held alternatively accountable if he or she "would be accountable for the underlying

offense under subsection (a)(1)(A) of § 1B1.3." U.S.S.G. § 2S1.1(a)(1) (emphasis added). This explicit cross-reference to subsection (a)(1)(A) of § 1B1.3 is critical, since subsection (a)(1)(A) only encompasses acts or omissions "caused by the defendant." The Sentencing Commission conspicuously did not cross-reference subsection (a)(1)(B) of § 1B1.3, which extends to the acts and omissions of co-conspirators that were, among other things, "reasonably foreseeable" to the defendant. Hence, the plain text of § 2S1.1(a)(1) indicates that a money launderer can only face an enhanced sentence for his or her own acts of drug distribution, but not for the reasonably foreseeable acts of co-conspirators. See Collins v. Yellen, — U.S. — , 141 S. Ct. 1761, 1782, 210 L.Ed.2d 432 (2021) ("[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."); see also U.S.S.G. § 2S1.1 cmt. 2(B) ("The fact that the defendant was involved in laundering criminally derived funds after the commission of the underlying offense, without additional involvement in the underlying offense, does not establish that the defendant" is accountable for the offense); U.S.S.G. § 1B1.3 cmt. 2 (a defendant is accountable under subsection (a)(1)(A) "for all quantities of contraband with which he was directly involved" (emphasis added)).

*Id.* at 1302. Therefore, Ms. Garcia could not be vicariously liable for Mr. Apaseo's actions just because they may have been foreseeable or because she was allegedly part of a conspiracy with him.

Returning to the instant case, even though the plea colloquy specified that Ms. Garcia laundered $3,961, the district court decided to attribute around $10,000 in laundered funds to her as the numerator in the fraction. In theory, the only variable missing was the denominator, the value of the drug, so that the district court could divide the amount of the laundered funds by the value of the drug to arrive at the amount of the drug, so that the base offense level could be calculated. The

government proposed to supply that variable through the testimony of an agent. However, the agent had no specific knowledge about this case nor of the amount of laundered funds that were derived from any drug load(s) in this case.

The task was further complicated by the fact that the only drug load whose composition was known was a seized load, which could not be a load from which the laundered funds were derived and was not necessarily representative of the other, preceding, unspecified load(s). To make matters worse, the seized load consisted of a variety of drugs, so calculating the amount of drugs in the unspecified prior load(s) was not as simple as dividing the amount of laundered funds by the price per kilogram of a particular drug.

The composition of the prior load(s) remains undetermined. The value of that load(s) remains undetermined. Therefore, the offense level for that prior load(s) from which the laundered funds remains undetermined, as it cannot be reliably determined.

Although the district court eventually settled on a base offense level of 28, the court admitted that how that number was arrived at was unclear on the record and expressed uncertainty and hesitation with the result, questioning whether it would withstand scrutiny on appeal. The court seemed to simply accept the government's claim that the correct number was 28, even though it was not clear how the government arrived at that number. It appeared that the government most likely

averaged the offense levels for the individual drugs, ignoring the fact that the seized load was not evenly comprised of each drug, and incorrectly claiming that there was no cocaine, which, if considered, would have lowered the resulting offense level. What was clear was that the government, and by extension the district court, did not calculate or provide a converted drug weight, as the Guidelines require when there are multiple drug types, in order to arrive at the resulting base offense level.

As will be further explained below in the following section/issue, and as should be apparent by now, the offense level was not correctly calculated. Although mistakes were made (such as ignoring the presence of cocaine and using values that were too low) that made the resulting sentence even worse, the offense level could not have been reliably calculated based on the available information. For example, the underlying load(s) from which the laundered funds were derived was never identified, nor its composition (type and amount of drug(s)) determined, and the only agent who testified had no knowledge about this case or the case-specific factors that he would have needed to know in order to arrive at accurate drug valuations for this case.

The necessary information/evidence was simply not present, and therefore the offense level for the underlying offense from which the laundered funds were derived simply could not be calculated. As a result, the second necessary

precondition was not met, and the cross-reference should not have been applied at all.

ISSUE THREE RESTATED: Whether the offense level for the underlying offense from which the laundered funds were derived was accurately determined.

Standard of Review

Once more, this Court "review[s] the district court's interpretation or application of the Sentencing Guidelines de novo and its factual findings for clear error." *United States v. Trujillo*, 502 F.3d 353, 356 (5th Cir. 2007) (footnote and italics omitted); *see also United States v. Soto*, 819 F.3d 213, 216 (5th Cir. 2016). Here, the enhancement was based on a combination of factual findings and interpretation or application of the Sentencing Guidelines, so review would also be a two-step process with different standards of review.

"'The government must prove factors for enhancement of sentencing by a preponderance of the evidence....'" *Trujillo*, 502 F.3d at 357 (5th Cir. 2007) (footnote and citation omitted). If properly preserved, a sentencing error is reviewed for abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51, 128 S. Ct. 586 (2007). If not properly preserved, it is reviewed for plain error. *United States v. Alaniz*, 726

F.3d 586, 618 (5th Cir. 2013). Ms. Garcia properly preserved her objections to the cross-reference and the resulting sentence, so review would be for abuse of discretion.

## C. The offense level for the underlying offense from which the laundered funds were derived was incorrectly calculated.

Once more, the Sentencing Guidelines set out the conditions that must be met before the cross-reference may be applied:

> The offense level for the underlying offense from which the laundered funds were derived, if (A) the defendant committed the underlying offense (or would be accountable for the underlying offense under subsection (a)(1)(A) of §1B1.3 (Relevant Conduct)); and (B) the offense level for that offense can be determined;

USSG § 2S1.1(a)(1). If the conditions are not met, then the base offense level starts at 8, depending on the value of the laundered funds. USSG § 2S1.1(a)(2).

As explained above in the preceding sections/issues, neither of the two necessary pre-conditions for the cross-reference to even be applied was met, and therefore the cross-reference should not have been applied. Furthermore, even assuming, for the sake of argument, that they had been met and that the cross-reference should have been applied, it was not correctly calculated. It was not even clear how it was calculated.

The drug load(s) from which the laundered funds were derived was not even identified, and the type and amount of drugs there remain unknown. Therefore, the offense level for that load(s) cannot be determined at all, let alone accurately. Just because the seized load consisted of certain drugs and amounts does not mean any prior load(s) from which the laundered funds were derived was the same.

Moreover, the alleged amount of funds laundered by Ms. Garcia was too high, resulting in a drug amount and base offense level that were also too high. Therefore, the numerator in the equation was too high. The district court's calculations were based on a laundered amount of approximately $10,000 ($10,300, to be exact), which was supplied by the PSR based on unspecified records. ROA.248-49. However, Ms. Garcia challenged this amount in her objections and at sentencing and argued that the district court should use the $3,961 amount from Ms. Garcia's plea colloquy. ROA.249-54.

Had the court used the lower figure, the resulting drug amounts would have been 60% lower (3,961/10,000=0.3961; 1-0.3961=0.6). A base offense level of 11 would have been 60% lower than the 28 applied by the district court. A sentence of 23 months would have been 60% than the 57 months imposed by the court. Therefore, the actual amount of the funds would have made a significant difference.

The drug values that the agent claimed were not specific to this case, and therefore the denominator was too low. The agent gave lower wholesale values, instead of the higher, actual "street" values.

He also gave lower values for the border area of the Rio Grande Valley in Texas, rather than the higher values in Houston and other areas further north where the drugs were going. Consequently, the resulting drug values were too low, and the resulting drug amounts and offense level too high. The agent was testifying as to drug values "in the local area", presumably the McAllen, Texas, border area where he was at the time. ROA.234. This was after the court clarified that it wanted to know the values "south of the checkpoint, cause I know everything goes up north of the checkpoint." ROA.232. Therefore, the court was asking for the lower values south of the checkpoint, rather than the higher values north of the checkpoint, such as in Houston. However, as noted in the PSR, Mr. Apaseo would always deliver the drugs to Austin, Dallas, or Houston, never locally. ROA.276. It was not clear whether the drugs were then sold on the street in Austin, Dallas, or Houston (all north of McAllen and of the checkpoint) or continued traveling north from there. Either way, the value of the drugs by the time they were actually sold and generated funds that could be laundered by Ms. Garcia or anyone else would have been significantly higher than they were in the local area south of the checkpoint, as the district court acknowledged. Therefore, by using the lower value in the local area

south of the checkpoint, even though the drugs were not sold there (they were seized and never sold, but presumably would have been sold in Austin, Dallas, or Houston or somewhere further north for higher values), the district court used a denominator (drug value) that was too low, resulting in a drug amount and base offense level that was too high.

The fact that the drug values were higher at the time of the events compared to the time of sentencing is also significant, because the higher the value (the denominator that the laundered funds are divided by), the lower the resulting drug amount, and therefore the base offense level, would be. By using incorrectly low values, the resulting drug amount and base offense level would be too high. The district court apparently used the valuations at the time of sentencing, rather than at the time of the events.

The district court argued that slight differences in valuation did not matter, because even if it used the higher $6,000/kilogram value for methamphetamine, the resulting drug amount would still be over 1.5 kilograms ($10,000/$6,000=1.67 kilograms) (which would still yield a base offense level of 32). ROA.246-47. As noted before, however, the $6,000 figure was apparently based on a wholesale local deal and was probably lower than the value would have been further north in Houston or beyond or in street/retail quantities. A slightly higher (approximately 11% higher) value of $6,711.41 would have resulted in an amount below 1.5

kilograms ($10,000/$6,711.41=1.489 kilograms). This would yield a base offense level of 30, instead of 32. *See* USSG § 2D1.1(c).

Using the $20,000/kilogram value for heroin that the agent had given would have yielded 0.5 kilograms of heroin ($20,000/$10,000=0.5 kilograms), resulting in a base offense level of only 26—6 levels lower than the calculation the district court made based on methamphetamine. *See* USSG § 2D1.1(c)(7). The government agreed that it would have arrived at a base offense level of 26. ROA.254.

Furthermore, it is unclear how the district court combined the resulting drug values to arrive at a combined base offense level, but apparently, the required converted weight calculation was not done.

Additionally, the district court did not give Ms. Garcia the "benefit of the doubt" like it said it would by calculating the base offense level based on fentanyl, which seemed to yield the lowest base offense level of all the specified drugs, besides cocaine.

Based on the government's misrepresentation that there was no cocaine, the district court failed to consider the value and potential amount of cocaine, the least serious drug, in its calculation, which could have resulted in a lower offense level and therefore a lower sentence. The district court seemed to base its valuation of cocaine based on prior caselaw, which seemed to support valuations between $10,000-$15,000 per kilogram. ROA.216-19. If the district court was correct about

the value of cocaine, then basing the offense level on cocaine would have resulted in a lower offense level than any of the other drugs, resulting in a base offense level of 24 ($10,000/$10,000=1 kilogram) (see USSG § 2D1.1(c)(8)), rather than the 28 that the court ultimately used. ROA.257.

Even if the district court were incorrect about the value of cocaine, cocaine still results in a lower base offense level than the other drugs and therefore is a less serious drug for purposes of sentencing. For example, one kilogram of cocaine results in a base offense level of 24. (USSG § 2D1.1(c)(8)); one kilogram of "actual" methamphetamine results in a base offense level of 34 (USSG § 2D1.1(c)(3)); one kilogram of fentanyl results in a base offense level of 30 (USSG § 2D1.1(c)(5)); and one kilogram of heroin also results in a base offense level of 30 (USSG § 2D1.1(c)(5)).

The base offense level of 24 that would have resulted with cocaine was 4 levels lower than the base offense level of 28 that the district court used. The district court eventually arrived at a total offense level of 25, yielding a Guideline range of 57-71 months and sentenced Ms. Garcia to 57 months' imprisonment. ROA.258. Had the total offense level been 4 levels lower at 21, it would have produced a Guideline range of 37-46 months. *See* USSG Ch. 5, Pt. A (Sentencing Table). Had the district court sentenced Ms. Garcia to the low end of this range, 37 months, the

sentence would have been 20 months lower than the actual sentence given, a reduction of about 35%.

Thirty-seven months would have still been too high of a sentence, because the cross-reference should not have been applied at all, for the reasons explained above, but even correcting this one mistake (ignoring the cocaine) would have lowered the sentence considerably. As described above, several other mistakes were made, and it is not even clear how the base offense level of 28 was calculated, and these errors compounded to result in a sentence much higher than Ms. Garcia should have received.

As Ms. Garcia explained in her objections, she should not have received the cross-reference, and without it, she would have been eligible for a sentence of time served or probation under the Guidelines:

| Guideline | Offense Level | Notes |
|---|---|---|
| § 2S1.1(a)(2) | 8+0 | No points should be added due to the amount of the laundered funds, because it is not more than $6,500, based on the amount ($3,961) mentioned in the stipulated plea facts. If the amount were more than $6,500 but not more than $15,000, then +2 would be added, and the adjusted offense level below would be 8 (still 0-6 months). |
| § 2S1.1(b)(2)(B) | +2 | Since the conviction was under 18 U.S.C. § 1956, unless that objection is granted |
| § 3E1.1 | -2 | Acceptance of responsibility |
| § 4C1.1 | -2 | Zero-point offender |
| Adjusted offense level | 6 | 0-6 months per Guidelines chart |

ROA.380. Instead, Ms. Garcia is still imprisoned because the cross-reference was erroneously applied.

## CONCLUSION

For the foregoing reasons, Ms. Garcia respectfully requests that this honorable

Court vacate her sentence and remand for resentencing and provide any further relief

to which she may be entitled.

Respectfully submitted,

LAW OFFICE OF CHRIS SULLY
5804 N. 23rd St.
McAllen, Texas 78504
(956) 413-7271

*/s/ Christopher Sully*
Christopher Sully
Attorney for Appellant

## CERTIFICATE OF SERVICE

On June 12, 2025, this brief was served upon Assistant United States Attorney

Carmen Castillo Mitchell via ECF.

*/s/ Christopher Sully*
Christopher Sully

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief contains approximately 11,423 words, excluding the parts of the brief exempted by 5TH CIR. R. 32(f).

2.      This brief is printed in a proportionally spaced typeface using Times New Roman 14-point font in text and 12-point font in footnotes, if any, using Microsoft Word.

3.      An electronic copy of this brief has been filed with the Court through ECF.


*/s/ Christopher Sully*
Christopher Sully